IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

ROSEMARY JACKSON WIMBLEY                                       PLAINTIFF

vs.                                   NO: 5:07CV00129BSM

ARKANSAS DEPARTMENT OF
CORRECTION, ET AL.                                            DEFENDANTS

## ORDER

Pending before the court are Defendants' motion and supplemental motion for summary

judgment. Plaintiff has responded and Defendants have replied. For the reasons stated below, the

motions are granted in part and denied in part.

## I. BACKGROUND

Plaintiff is an African-American female who began her employment at the Arkansas

Department of Correction ("ADC") as a correctional officer in August of 1997. At the time of her

termination on April 7, 2005 she was a corporal. During the time relevant to the case, she was

assigned to ADC's Delta Regional Unit in Dermott, Arkansas. Defendant Larry Norris is Director

of the ADC and Defendant Mark Cashion is Warden of ADC's Delta Regional Unit.

Correctional officers are furnished and trained in the use of various weapons and devices to

support their security duties, including a chemical spray or pepper spray known as "Cap-Stun."

During her working hours, Plaintiff, like other correctional officers, wore a holster which held the

"Cap-Stun" cannister.

On March 30, 2005, Plaintiff did not bring her holster to work, and therefore she was not

issued a spray cannister at the beginning of her shift. She was asked to escort a civilian medical

employee, Nurse Barbara Boatner, for "pill call" in various cell blocks or "pods." Plaintiff had

accompanied Boatner numerous times on "pill call."

Boatner's schedule for that day included the isolation pod, where inmate Michael Coleman had a history of verbally and physically abusing the correctional officers, to the point where civilian personnel were reluctant to enter the isolation pod.   Plaintiff advised her direct supervisor, Sergeant Steve Smith, that she had left her pepper spray holster at home and asked to have a Cap-Stun cannister for the nurse's rounds that day. (Plaintiff's Exhibit B)

Smith gave Plaintiff his cannister.   As she had no holster, she carried it forward in her hand. After Plaintiff got the spray,  Boatner said that she would not go to the isolation pod because she did not want to put up with Coleman's behavior that day.  Plaintiff then proceeded to escort Boatner to the next scheduled pod, B pod, for dispensing the inmates' medicine.

Plaintiff had received a report from security personnel at the facility that morning that Inmate Weatherspoon of B pod had been observed from an outside window exposing his sexual parts and acting out masturbation. Upon entering B pod, Plaintiff announced, "If I see any penises, I'm going to spray them, spray you, give you a reason to hold onto it." [Plaintiff's Dep. p. 13].  Plaintiff states that she did not intend to use the pepper spray but only to discourage any offensive behavior.

At some point Plaintiff had a conversation with an inmate and apparently raised her hand holding the Cap-Stun cannister into the air.  Inmate Ventress alleges that Plaintiff sprayed him with the Cap-Stun.   About ten minutes after Boatner and Plaintiff left the pod, the inmates began complaining of a smell from  a chemical agent in the area and asked to be removed from the pod.

Immediately after the inmates reported the smell and asked to be evacuated, Plaintiff, Smith and Officer McCauley began removing the inmates to the hallway.  Smith denied Ventress's request to see a superior officer.  When Ventress, who was in handcuffs, resisted returning to the cell, Smith

sprayed Ventress with pepper spray, threw him on the floor, and placed his knee upon Ventress' neck.  (Plaintiff's Exhibit B).

After this incident, Smith went to see Captain Walls, the Building Captain, concerning what had occurred and to show the injuries to his hand he sustained from Ventress.  (Plaintiff's Exhibit M).  Walls demanded statements from all personnel involved.  Statements were taken from Plaintiff, Smith, Boatner, and McCauley.  The inmates completed grievance forms.

In his grievance form, Ventress wrote that Plaintiff made a statement and then sprayed him. He wrote that Plaintiff told him that the spraying was accidental.  He complained of the treatment he received from Smith, stating that Smith sprayed him two times and assaulted him while he was in handcuffs. (Plaintiff's Exhibit H).

Inmate Michael Long wrote in his grievance form that Plaintiff had sprayed Ventress but that she stated it was an accident.  Long also described Smith's treatment of Ventress, stating that Smith "grabbed Ventress and pepper sprayed him then threw him to the ground.  He sprayed Ventress again and put his knee into the inmate's neck.  Ventress sat up and stated that he couldn't breath. [sic]. Ventress was in handcuffs and Sgt. Smith yanked him to his feet by the handcuffs.  Then he leg sweeped [sic] Ventress back to the ground."  Long wrote that Ventress was not resisting at the time. (Plaintiff's Exhibit I).

Inmate Virgil Weatherspoon, in his grievance form, wrote that Plaintiff came in the pod playing with her "mace," and said something about spraying someone's penis if he pulled it out.  He said he started to smell mace.  Ventress told him that Plaintiff had sprayed him.  Weatherspoon further wrote that  Smith evacuated the inmates to the lobby in handcuffs, and that when Ventress asked to see the Lieutenant, Smith sprayed Ventress while he was in handcuffs, then slammed him

to the ground and put his knee in his neck, and then picked Ventress up and slammed him again. (Plaintiff's Exhibit J).

Nurse Boatner also provided a statement on March 30, 2005.  In her statement, Boatner wrote that Plaintiff had a pepper spray cannister in her hand, but that she did not see Plaintiff spray anything.  She also did not smell any pepper spray. (Plaintiff's Exhibit G).

Correctional officer Robert McCauley's incident report does not address Plaintiff but only reports on Smith's actions.  He reported that Smith sprayed Ventress in the face with pepper spray after Ventress refused a direct order to renter his cell and resisted Smith's action to lead him to the cell.  (Plaintiff's Exhibit K).

In Smith's incident report , he wrote that four inmates were evacuated due to a small amount of Cap-Stun that Plaintiff had discharged about 10 minutes earlier while escorting Boatner.  He reported that he sprayed Ventress when Ventress resisted and threw his shoulder into Smith. He stated that he sprayed Ventress with a second burst of Cap-Stun when Ventress made threatening remarks to Smith.  (Plaintiff's Exhibit L).

Captain Walls prepared a memorandum to Warden Cashion in which reported that Plaintiff stated that her cannister of Cap-Stun had accidentally discharged and that she evacuated the four inmates in the B pod.  Walls wrote that upon his arrival to the building, he found Ventress seated on the floor in front of the Jail Control booth, in hand restraints, and exhibiting the effects of exposure to the Cap-Stun.  Ventress was agitated, and complained that Smith had sprayed him for no reason. Ventress was placed in a shower for decontamination protocol.

Captain Walls advised both Smith and Plaintiff that the "decisions and actions taken were not acceptable" and that he as the ranking officer, should have been alerted to the incident.  He stated

that while the situation was never "life-threatening" there was no justification for the failure of Smith and Plaintiff to advise him of the incident until after the fact.  Captain Walls wrote to Cashion that "[e]mployee discipline was pending" on both Smith and Plaintiff "pertaining to their performance or lack thereof."  Walls submitted the documentation to Cashion's office. (Plaintiff's Exhibit M).

Cashion met with Plaintiff on April 1, 2005.  During their meeting, Plaintiff explained that the Cap-Stun spray discharged but stated that it was not done intentionally.  She said it discharged accidentally.  She said she knew that she could not spray an inmate locked behind the cell. Furthermore, she had no reason to spray as no one had their penis out.  Cashion stated that he had a tape showing Plaintiff with her arm straight out pointing the cannister at Ventress.  Plaintiff denied that she intentionally sprayed Ventress.  Cashion placed Plaintiff on administrative leave while he concluded his investigation.  (Defendants' Exhibit 3).

On April 2, 2005, Boatner was interviewed by Assistant Warden Outlaw and Captain Walls. She stated that Plaintiff told Ventress to get his hand off of himself.   She stated that she did not see Plaintiff spray and didn't smell the Cap-Stun.  (Plaintiff's Exhibit N).

Smith signed an affidavit on April 3, 2005, stating that he saw Plaintiff raise her Cap-Stun can to shoulder level in front of Ventress' cell.  Smith did not see any spray come out of the cannister and did not smell any Cap-Stun.  About 15 or 20 minutes later, Smith could smell a small amount of Cap-Stun in the B pod area.  (Plaintiff's Exhibit O).

Correctional Officer Robert M. McCauley signed an affidavit on April 3, 2005, stating that he observed Plaintiff ask Smith for his spray cannister to take into the B pod.  He stated that he heard Plaintiff tell Smith that Ventress had been exposing himself to her.  McCauley saw Plaintiff shaking the Cap-Stun cannister in the direction of Ventress but he could not smell any Cap-Stun.  McCauley

entered B pod about fifteen minutes after Plaintiff and Boatner left.  He could detect the odor of Cap-Stun but stated that it was not very strong.  (Plaintiff's Exhibit P).

Inmate Long provided a witness statement on April 5, 2005 in which he wrote that Plaintiff sprayed "mace" at Ventress for no "justified reason."  He stated that after the inmates were removed from the pod, they asked Smith to speak to the Lieutenant or Captain.  Smith denied their request and Ventress' request for a shower.  According to Long, Smith asked Ventress if he was refusing to go to the cell, grabbed him and sprayed him with pepper gas.  Smith threw Ventress to the ground, put his knee in Ventress' neck and sprayed him again.  Ventress complained that he could not breathe.  Smith then grabbed Ventress by the handcuffs, yanked him to his feet and then leg swept Ventress back to the floor.  Long wrote that Ventress was handcuffed the entire time and was not hostile or resistant. (Plaintiff's Exhibit Q).

Inmate Mitchell gave a witness statement on April 5, 2005, in which he wrote that Plaintiff entered the B pod stating something about catching someone with their penis in their hands.  He wrote that Plaintiff sprayed the pepper spray when Plaintiff came to Ventress' cell.  His account of Smith's actions is similar to that of Long's.  (Plaintiff's Exhibit R).

Inmate Weatherspoon also gave a witness statement on April 5, 2005, in which he wrote that he heard Ventress say Plaintiff was "crazy."  He does not make any statement as to whether he saw Plaintiff discharge the pepper spray or that he smelled the Cap-Stun.  His account of Smith's actions is similar to that of Mitchell and Long.  (Plaintiff's Exhibit S).

On April 5, 2005, Major D. Harris issued his investigative report to Cashion stating that he had interviewed Ventress on April 4, 2005.  He reported that Ventress stated that Plaintiff had accidentally sprayed pepper spray in his cell.  According to Harris' notes from the interview,

Ventress stated that Plaintiff did not spray at his face but sprayed down at the ground.  Ventress further reported that he was sprayed by Smith for no reason, and then beat by Smith for asking to see the captain or lieutenant.  Ventress refused to give Harris a witness statement.

Harris also reported that he questioned inmates Long, Weatherspoon, and Mitchell and that during the interviews all three inmates agreed that:

> 1. Plaintiff came into the B Pod stating that if someone had their penis in their hand that they would be sprayed with pepper spray.
> 2.  There was a pepper spray smell in the Pod after Plaintiff left.
> 3.  Smith denied their request for a shower when they were evacuated.
> 4.  Ventress told Smith that he wanted to see a lieutenant or captain.
> 5.  Smith told Ventress to go to his cell or he would be sprayed with pepper spray.
> 6.  Smith sprayed Ventress twice with pepper spray and slammed him on the floor twice while he was handcuffed behind his back.

Harris stated that upon reviewing the tape, he could see Plaintiff come into the B pod with the nurse and after the nurse left Plaintiff lifted the Cap-Stun to shoulder height pointed at Ventress.  Harris requested that a more extensive investigation be done on the incident as well as determine if anyone tried to intentionally damage the video tape.  (Plaintiff's Exhibit T).

Cashion had a termination hearing with Plaintiff on April 6, 2005.  Plaintiff reiterated that she had no reason to spray anyone and that the spray was accidentally discharged.  She stated that she needed the spray because she and Boatner were going to the isolation pod where Coleman might become abusive.  Plaintiff explained that although she got the Cap-Stun in anticipation of escorting Boatner to isolation, they did not go there.  She admitted to pointing the cannister at Ventress but stated that she did not spray him.

Near the end of the April 6, 2005 meeting, Cashion notified Plaintiff that he was terminating her employment with ADC.  He stated the following for his reasons:

I think there's some conflicts as far as the, whether you actually sprayed the guy in

the face or sprayed it on the floor[.] I don't think there's any doubt that you had the Capstun in your hand when you went in there and issued a warning to all the inmates, and to me, that is a threatening and harassing statement. And I think it violates every policy we have as far as fair treatment to the inmates and keeping them in an environment that is safe for themselves and also for our officers. And . . . I think you verbally abused him, or all of them in there. I also think that you used a physical agent, whether you meant to spray it or not, you took the can in there. It's like pulling a gun out and pointing it at somebody. It's a threatening gesture. I think that certainly was used to harass that inmate. And I think that within those confinements that the security and the good order of certainly the department and the unit were put at risk. And I'm going to terminate your employment with us.

(Defendants' Exhibit 3).

Cashion issued a termination letter to Plaintiff on April 7, 2005. In the letter he stated:

When questioned by Mr. Outlaw, Nurse Boatner stated that you did not go in isolation as you stated. You had gotten Sgt. Smith's Cap-Stun because the inmates in "B" Pod had been pulling out their things (penises). She also stated that you said if they did, you would spray them. You did argue with Ventress because he had his hand on his penis and this seemed to not be the first time that this had happened. You have not taken Cap-Stun with you before when escorting medical staff; however, on this occasion, you asked for it just before you went in "B" Pod which indicates premeditation on your part. You denied having words with Inmate Ventress, when in actuality you did.

Through your own admission, you stated that you threatened the inmates with Cap-Stun and that this was not the first time this had occurred. You are aware through training (Nov. 2004) that chemical agents are considered physical force. You entered the pod with the intent to intimidate, threaten and harass these inmates even though they were locked up and unable to physically reach you. You planned and carried through with your threat should the inmates expose themselves to you. The fact that you did not spray the inmate directly does not relieve you of your responsibility as a correctional officer to follow policy and keep a safe and humane environment for the inmates under your supervision. Therefore, I find you have violated AD00-10, Section 21, Subsections C, D & E. Although Subsections C & D start at a lower level of discipline, your actions have adversely affected the security and good order of the unit and departmental operations and because of the severity of your actions, I am bypassing progressive discipline. You are hereby terminated from the Arkansas Dept. of Correction effective April 7, 2005.

(Defendants' Exhibit 2, Decl. Exhibit B).

On April 7, 2005, Cashion wrote a memo to the director of internal affairs, James Gibson,

concerning Ventress's allegations of the alleged assault by Plaintiff and Smith.  Plaintiff had already been terminated.  Cashion summarized his unit's investigation.  He stated that according to witness statements, Plaintiff did not spray Ventress at the time she pointed the Cap-Stun at him but that some spraying was done in the area before she left.  He further noted that Ventress stated that Plaintiff sprayed the Cap-Stun on the ground.  He requested that Internal Affairs "investigate this matter to determine should charges be filed on [Plaintiff] and also, was there any assault on this inmate by Sgt. Smith."   (Plaintiff's Exhibit U).

Plaintiff filed a grievance regarding her termination on April 12, 2005.  (Defendants' Exhibit 5, Decl. Exhibit A).  Plaintiff was notified on April 18, 2005, that ADC Director Norris had chosen to submit her grievance to a three-member "Internal Review Committee" which was then to make a recommendation to Norris.  Plaintiff was notified that the IRC hearing would be held on May 3, 2005. (Defendants' Exhibit 5, Decl. Exhibit B).  Plaintiff withdrew her grievance on April 29, 2005. She attempted to reinstate her grievance on June 20, 2005, however the ADC rejected her request as the refiling of the grievance was outside the time limit allowed by the grievance policy. (Defendants' Exhibit 5).

 On April 27, 2005, Gibson notified Cashion that Internal Affairs had conducted an investigation.  He requested that Cashion note his disposition on the matter after reviewing the investigative report.  On May 5, 2005, Cashion exonerated Smith, finding that the allegations were true but that the actions were within departmental policy.  He further noted that Plaintiff had been terminated, "violated policy."   (Plaintiff's Exhibit W).

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission on October 28, 2005, alleging that her termination was based on her race and sex.

(Defendants' Exhibit 6).  The EEOC issued Plaintiff a right to sue letter on October 31, 2005. (Defendants' Exhibit 7).  Plaintiff filed a lawsuit in federal court on January 30, 2006, Case No. 5:06CV019 WRW.  On June 2, 2006, United States District Judge William R. Wilson dismissed the case without prejudice for failure to prosecute.

Plaintiff filed this action on May 31, 2007, alleging violations of Title VII, and 42 U.S.C. §§ 1981 and 1983.  On October 25, 2007, the court dismissed Plaintiff' §§ 1981 and 1983 claims against the Arkansas Department of Correction, and the §§ 1981 and 1983 claims for monetary relief against Larry Norris in his official capacity, and Mark Cashion in his official capacity.  The court dismissed Plaintiff's Title VII claim against Norris and Cashion.  Plaintiff was directed to file an amended complaint by November 9, 2007, clarifying her allegation with regard to when she was discharged.  On April 17, 2008,  Defendants moved for summary judgment.

## II.  SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  On summary judgment, "[t]he burden of demonstrating that there are no genuine issues of material fact rests on the moving party." *Winthrop Resources Corp. v. Eaton Hydraulics, Inc*., 361 F.3d 465, 468 (8th Cir. 2004). To be a genuine issue of fact, the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Depositors Ins. Co. v. Wal-Mart Stores, Inc.*, 506 F. 3d 1092, 1094 (8th Cir. 2007).  To be a material fact, the factual issue must potentially affect the outcome of the suit under governing law.  *Id*.

In considering a motion for summary judgment, the court views the evidence in the light most

favorable to the nonmoving party, giving her the benefit of all reasonable inferences drawn from the record. *Hannoon v. Fawn Eng'g Corp.*, 324 F. 3d 1041, 1045-46 (8th Cir. 2003). However, once the moving party has met its burden of demonstrating the absence of a genuine issue of material fact, the non-moving party is required to show that there are facts in dispute, which if proved, would support the jury returning a verdict in its favor. *Gregory v. City of Rogers, Ark.*, 974 F.2d 1006, 1010 (8th Cir.1992). The non-movant must put on evidence that is more than "merely colorable" or "not significantly probative." *Id.* It may not rest on mere denials or allegations but must set forth specific facts to raise a genuine issue of fact for trial. *Wingate v. Gage County Sch. Dist., No. 34*, 528 F. 3d 1074, 1078-79 (8th Cir. 2008).

The Eighth Circuit has stated that "[s]ummary judgment should seldom be granted in the context of employment discrimination cases because of their being inherently fact based." *Buboltz v. Residential Advantages, Inc.,* 523 F. 3d 864, 871 (8th Cir. 2008). However, it has also noted that there is no "discrimination case exception" to the application of Rule 56. *Pope v. ESA Services*, 406 F. 3d 1001, 1006 (8th Cir. 2005).

## III. ANALYSIS

Plaintiff agrees that she does not have a § 1981 claim against Norris and Cashion. Thus, the only remaining claims are Plaintiff's Title VII claim, Plaintiff's § 1983 claims against Norris and Cashion in their individual capacities, and Plaintiff's § 1983 claims for injunctive relief against Norris and Cashion in their official capacities.

### A. Title VII Claim

The court, in its order of October 25, 2007, found that there was a dispute as to whether Plaintiff timely filed her claim with the EEOC. The court directed Plaintiff to file an amended

complaint by November 9, 2007, clarifying her allegation as to when she was discharged, or the court would dismiss her Title VII claims.  Plaintiff did not file the amended complaint as ordered.

Although dismissal of the Title VII claim is justified based on Plaintiff's failure to comply with the court's order, the court finds that dismissal is also warranted because Plaintiff's Title VII claim is barred.  A Title VII action must be filed within 90 days of receiving the Notice of Right to Sue from the EEOC.  Here, the EEOC mailed the notice to Plaintiff on October 31, 2005.  Plaintiff failed to file this lawsuit within the ninety days.

The Arkansas "savings clause" does not apply to a Title VII action.  *See Garrison v. Int'l Paper Co.*, 714 F. 2d 757, 759 n. 2 (8th Cir. 1983) ("Because the Title VII actions are governed by a federal statute of limitations, the Arkansas saving clause is inapplicable.") While the ninety-day limitation of 42 U.S.C. § 2000e-5(f)(1) is not a jurisdictional prerequisite, and is subject to equitable tolling in appropriate circumstances,  *Hill v. John Chezik Imports*, 868 F. 2d 1122, 1124 (8th Cir. 1989),   Plaintiff has not presented any reason for tolling the statute of limitations.  Therefore, the court finds that Plaintiff's Title VII claim should be dismissed.

B.  Plaintiff's § 1983 Claims

1.  Norris in his Individual Capacity

Under § 1983, a supervisor cannot be held liable on the theory of respondeat superior for an employee's unconstitutional actions. *Boyd v. Knox*, 47 F. 3d 966, 968 (8th Cir. 1995).  A supervisor's liability arises only if he directly participates in a constitutional violation. To establish personal liability on the part of Norris, Plaintiff "must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Mayorga v. Missouri*, 442 F. 3d 1128, 1132 (8th Cir. 2006).

Plaintiff has presented no evidence to establish that Norris was personally involved in the termination decision.  In fact, in her deposition, she admitted that Norris had no involvement other than as Director of the ADC .  Therefore, the court finds that the § 1983 claims against Norris in his individual capacity should be dismissed.

2.  Due Process

To the extent that Plaintiff claims she was denied due process, her claim must fail.  To receive procedural due process protection, Plaintiff must establish that she has a protected property interest in continued employment.  A property interest arises from a "legitimate claim of entitlement" to continued employment.  *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).  If she does, then she would be entitled to a hearing to contest the reasons for her termination.

In determining whether Plaintiff had a property interest, the court looks to state law or some other independent source.  Plaintiff has not established a property interest.  The Arkansas Supreme Court has stated that "unless an employment manual contains an express provision that the employer may not fire an employee except for cause, the employment relationship is 'at will.'" *Thompson v. Adams*, 268 F. 3d 609, 612 (8th Cir. 2001).  To overcome the employment at will doctrine, the employment handbook or policy manual must contain an express provision that the employee can only be terminated for cause.  *Bennett v. Watters*, 260 F. 3d 925, 928 (8th Cir. 2001) and Plaintiff has presented nothing indicating that there is a ADC policy, handbook or manual that provides that ADC employees may be terminated only for cause.   Thus, the court finds that Plaintiff's procedural due process claim must be dismissed.

Plaintiff also contends that she has a liberty interest in her employment, entitling her to a "name clearing" hearing.  To establish a protected liberty interest, Plaintiff must show that

Defendants, in connection with discharging her, "publicly made allegedly untrue charges against [her] that would stigmatize [her] so as to seriously damage her standing and association in the community, or foreclose her freedom to take advantage of other employment opportunities." *Stodghill v. Wellston Sch. Dist.*, 512 F. 3d 472, 476 (8th Cir. 2008) (citations and internal quotation marks omitted).

Plaintiff states that she was stigmatized when Defendants chose to conclude that she "had committed wrongful and injurious personal actions against captive persons, . . . failed to correct such reports in spite of investigations showing that [Plaintiff's] conduct had been negligent at worst, and then further stigmatized [Plaintiff] by discharging her summarily from employment while exonerating . . a white male officers whose . . . actions . . .were far more wrongful and egregious than anything done by [Plaintiff]." (Doc. No. 32, p. 2). Statements concerning unsatisfactory performance or general misconduct are insufficient to create a stigma implicating an employee's liberty interest, while statements accusing an employee of dishonesty, criminality, racism, and the like may be sufficiently stigmatizing to implicate an employee's liberty interest. *Buchholz v. Aldaya*, 210 F. 3d 862, 866 (8th Cir. 2000).

Here, Defendants' statements concerning Plaintiff's unsatisfactory job performance are insufficient to create a stigma implicating Plaintiff's liberty interest in her reputation. *See Mascho v. Gee*, 24 F. 3d 1037, 1039 (8th Cir. 1994) (unsatisfactory performance or general misconduct do not rise to requisite level of constitutional stigma). Even assuming that Plaintiff had a liberty interest entitling her to a "name clearing hearing," she received the due process to which she was entitled. Prior to the termination decision, Cashion notified Plaintiff of the charges and gave her an opportunity to present her side of the story. *See Winskowski v. City of Stephen*, 442 F. 3d 1107, 1110

(8th Cir. 2006) (all that is required for pre-termination hearing is that employee have notice of charges and opportunity for employee to present his side of story). Additionally, Plaintiff cannot prevail on her due process claim because she failed to request a post-termination hearing. *Id.* (government employee cannot recover for due process violation where employee failed to avail himself of post-termination process that was available).

For all the reasons set forth above, the court finds that Plaintiff's Due Process claims should be dismissed.

3. <u>Discrimination</u>

At the summary judgment stage, the issue in a discrimination case is "whether the plaintiff has sufficient evidence that unlawful discrimination was a motivating factor in the defendant's adverse employment action." *Roberts v. Park Nicollet Health Services*, 528 F. 3d 1123, 1127 (8th Cir. 2008) (internal quotation marks and citation omitted). A plaintiff raising a claim of discrimination may survive a motion for summary judgment either by proof of direct evidence of discrimination or by creating an inference of discrimination under the burden-shifting test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973) and then rebutting any proffered nondiscriminatory reason for the employment decision with sufficient evidence of pretext. *King v. Hardesty*, 517 F. 3d 1049, 1057 (8th Cir. 2008).

As Plaintiff has not presented any direct evidence, the court applies the *McDonnell Douglas* framework. " Under the *McDonnell Douglas* framework, a presumption of discrimination is created when the plaintiff meets [her] burden of establishing a prima facie case of discrimination." *Pope*, 406 F. 3d at 1006. Once Plaintiff establishes her prima facie case, the burden of production shifts to Defendants to show that they had a legitimate, nondiscriminatory reason for their actions. If

Defendants can articulate a legitimate, nondiscriminatory reason, the burden returns to Plaintiff to prove that the proffered reason is pretextual. *Beaden v. Int'l Paper Co.*, 529 F. 3d 828, 831-32 (8th Cir. 2008).  The *McDonnell Douglas* framework applies to claims of race and gender discrimination under  42 U.S.C. § 1983. *Clegg v. Arkansas Dep't of Correction*, 496 F. 3d 922,  926 (8th Cir. 2007) (section 1983, Title VII and Arkansas Civil Rights Act).

To establish a prima facie case of discrimination, Plaintiff must show that (1) she is a member of a protected class; (2) that she was meeting her employer's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that similarly situated employees outside the protected class were treated differently.  *Fields v. Shelter Mut. Ins. Co.*, 520 F. 3d 859, 864 (8th Cir. 2008).  Defendants do not contest the first three elements of the prima facie case.  They assert, however, that Plaintiff cannot establish that she was treated less favorably than a similarly situated non African-American male.

Plaintiff counters that she is similarly situated to Smith, a white male, and that he was granted more favorable treatment.  For the purposes of establishing a prima facie case, the Eighth Circuit has set a "low threshold standard" for determining whether employees are similarly situated.  Plaintiff need only show that she and Smith were "involved in or accused of the same or similar conduct" but "were disciplined in different ways." *Rodgers v. U. S. Bank, N.A.*  417 F. 3d 845, 852 (8th Cir. 2005) (citation and internal quotation marks omitted).   In this instance, Plaintiff and Smith had the same supervisor, and they were both involved in an incident in which Cap-Stun was used.  Smith was exonerated while Plaintiff was terminated.  The court finds that Plaintiff has established a prima facie case of discrimination.

The court further finds that, for purposes of this summary judgment motion, Defendants have

articulated a legitimate, nondiscriminatory reason for their action.   The burden, therefore, falls on Plaintiff to demonstrate that Defendants' asserted reason is pretextual.   A plaintiff may establish pretext by different means, including that the employer failed to follow its own policies and treated similarly-situated employees in a disparate manner.   *Arnold v. Nursing and Rehab. Ctr. at Good Shepherd, LLC*, 471 F. 3d 843, 847 (8th Cir. 2006)  Regardless of the method used to prove pretext, a plaintiff "must demonstrate that a discriminatory animus lies behind the defendants' neutral explanations."   *Roxas v. Presentation Coll.*, 90 F. 3d 310, 316 (8th Cir. 1996).

Plaintiff asserts that Cashion's more favorable treatment of Smith is evidence of pretext.   At the pretext stage, the test for determining whether an employee is similarly situated to a Plaintiff is a rigorous one.   Plaintiff must show that she and Smith are similarly situated in all relevant respects. *Rodgers*, 417 F. 3d at 853.

Both Smith and Plaintiff were correctional officers, with similar job duties.   They were both supervised by Cashion.   Both were furnished equipment to support their security duties, including the Cap-Stun, and trained in their use.   Plaintiff, like Smith, had a cannister of Cap-Stun available to her throughout the duty day.   Both are accused of using Cap-Stun against an inmate.   Defendants argue that Plaintiff's conduct in threatening to spray Cap-Stun was unjustified and served no legitimate purpose except to harass and intimidate.   They claim, on the contrary, that  Smith was wholly justified in his use of spray.   A reasonable jury, however, could find that Smith and Plaintiff were similarly situated, and that both Smith's and Plaintiff's actions were excessive, and similarly done  to harass and intimidate Ventress or that neither Smith's actions nor Plaintiff's actions were excessive and done to harass and intimidate Ventress.   Further, the court finds that a reasonable jury could find that Smith's actions were excessive and done to harass and intimidate Ventress, while

Plaintiff's actions were neither excessive, nor done to harass and intimidate Ventress.

Defendants argue that the inmate grievances to support Plaintiff's assertion that Smith acted inappropriately is hearsay testimony and should carry no weight in a summary judgment analysis. The court, however, finds that the inmates describe what they saw and heard in the grievance forms. The grievance forms are therefore similar to the incident reports filed by Boatner, Smith, and McCauley and should be given equal weight.

There is a real question of fact as to Cashion's actions in terminating Plaintiff.  On one hand, despite Plaintiff's assertion that the spraying was accidental, Cashion refused to believe her and the many statements and reports which supported her version of the events.  Indeed, Cashion characterized Plaintiff's actions as premeditated despite substantial evidence to the contrary.  On the other hand, Cashion believed Smith's reasons for his actions despite all of the statements indicating that Smith sprayed Ventress twice and kicked him while he was handcuffed, all while Ventress offered no resistance.  Cashion also appears to have ignored Captain Walls's description of Ventress's condition and his opinion that the conduct of both Plaintiff and Smith was unacceptable.

Plaintiff was terminated for violating violated AD00-10, Section 21, Subsections C, D and E.  Subsection C proscribes verbal abuse, Subsection D proscribes unnecessary or excessive force, and Subsection E proscribes physical abuse used to punish or harass.  Cashion relies on a videotape showing Plaintiff allegedly aiming the Cap-Stun at Ventress and then Ventress going to the sink in his cell.  The videotape, however, did not show Plaintiff spraying the Cap-Stun.

A reasonable jury could find that there was insufficient evidence for Cashion to conclude that Plaintiff physically abused or used unnecessary or excessive force while there was sufficient evidence to conclude that Smith was physically abusive.  Even Ventress, the affected inmate,

testified that Plaintiff's release of pepper spray was accidental.  Additionally, Cashion admitted that the evidence showed that Plaintiff had not sprayed Ventress in the face but that some spray was discharged to the floor.  A reasonable jury could find that Cashion's action in discharging Plaintiff was excessive in comparison to the wrongful conduct, and that his action was based on Plaintiff's sex and race.

Furthermore, Cashion did not follow the same procedures with regard to Smith and Plaintiff. According to the use of force policy, reports of incidents involving use of force are to be forwarded to the internal affairs division for review.  Cashion terminated Plaintiff before asking the internal affairs division to investigate the incident.  He, however, took no disciplinary action against Smith but sent the incident to internal affairs.  The investigative report, which has not been provided to the court, allegedly gave Cashion support for exonerating Smith.  The jury could find that Cashion's action in  terminating Plaintiff prior to the investigation, while relying on the investigative report to exonerate Smith, is evidence of pretext.

In sum, the court finds that there are genuine issues of material fact as to whether Cashion's action in discharging Plaintiff was pretextual.  Thus, the court finds that Defendants are not entitled to summary judgment on Plaintiff's discrimination claim.

4.  Qualified Immunity

Cashion claims he is entitled to qualified immunity.  Qualified immunity is available to government officials who prove their conduct did 'not violate clearly established statutory or Constitutional rights of which a reasonable person would have known.'"  *Hill v. Scott*, 349 F. 3d 1060, 1071 (8th  Cir. 2003) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To avoid summary judgment based on qualified immunity, Plaintiff must (1) "assert a violation of a

constitutional right; (2) demonstrate that the alleged right is clearly established; and (3) raise a genuine issue of fact as to whether the official would have known that his alleged conduct would have violated the plaintiff's clearly established right." *Brockinton v. City of Sherwood, Arkansas,* 503 F. 3d 667, 672 (8th Cir. 2007 ) (internal quotation marks and citation omitted).

"Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law. But if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment. " *Olson v. Bloomberg,* 339 F.3d 730, 735 (8th Cir. 2003) (citation omitted).

There is no disagreement that Plaintiff's's right to be free from racial or sexual discrimination was clearly established at the time of the events giving rise to the lawsuit.   As discussed above, there is a genuine factual dispute as to whether Cashion violated Plaintiff's constitutional right to equal protection.   Therefore, the court finds that Cashion is not entitled to qualified immunity.

## IV.  CONCLUSION

Accordingly, Defendants' motion for summary judgment (Doc. No. 14) and supplemental motion for summary judgment (Doc. No. 19) are granted in part and denied in part. Plaintiff's Title VII claim is dismissed; Plaintiff's Due Process claims are dismissed; the claims against Norris in his individual capacity are dismissed. In all other respects, the motions for summary judgment are denied.   Plaintiff's second motion for extension of time to file a response (Doc. No. 35) is denied as moot.

Defendants have filed a motion for continuance of the September 8, 2008 trial because Defendant Norris will be preparing for a September 10, 2008 execution. The individual claims against Norris have been dismissed, therefore his presence at trial may not be necessary.  The court

denies the motion for continuance (Doc. No. 43) without prejudice to renew should Defendants

determine that Norris needs to be present at the trial.

IT IS SO ORDERED this 28th day of July, 2008.


_____

UNITED STATES DISTRICT JUDGE